Filed 12/17/20  P. v. Zambrano CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELADIO CISNEROS ZAMBRANO,<br><br>Defendant and Appellant. | F076737<br><br>(Super. Ct. No. F17904027)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Eladio Cisneros Zambrano challenges his convictions for second degree murder and assault with a firearm.  On appeal, he contends (1) the trial court erred in declining to instruct the jury on the heat of passion theory of manslaughter and (2) insufficient evidence supported the conviction for assault with a firearm.  We affirm.

## PROCEDURAL SUMMARY

On August 16, 2017,[1] the Fresno County District Attorney charged defendant with murder (Pen. Code, § 187;[2] count 1), shooting at an occupied motor vehicle resulting in death (§ 246; count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 4), assault with a firearm (§ 245, subd. (a)(2) (section 245(a)(2)); count 5); and discharging a firearm with gross negligence (§ 246.3, subd. (a); count 6).  The information further alleged defendant personally and intentionally discharged a firearm resulting in death (§ 12022.53, subd. (d)) as to counts 1 and 2, and had served three prior prison terms (§ 667.5, subd. (b)).

On November 1, the jury returned verdicts finding defendant not guilty of first degree murder but guilty of the lesser included offense of second degree murder on count 1, and guilty as charged on all other counts.  The jury also found the firearm allegations on counts 1 and 2 true.  Prior to sentencing, the prosecution dismissed one of the prior prison term allegations, and defendant admitted the remaining two.

On December 18, the trial court sentenced defendant to 44 years to life in prison as follows:  on count 1, 15 years to life, plus a 25-year-to-life firearm enhancement; on count 2, seven years, stayed pursuant to section 654;[3] on count 3, three concurrent years;

---

[1]  All dates refer to 2017 unless otherwise noted.

[2]  All statutes refer to the Penal Code.

[3]  Finding that counts 1 and 2 were predicated upon the same course of conduct, the trial court struck count 2's firearm enhancement based on section 12022.53, subdivision (f)'s prohibition against multiple punishments for a single criminal act.

on count 4, three consecutive years; on count 5, four consecutive years; and on count 5, three concurrent years. The court struck the two prior prison term allegations.

On December 21, defendant filed a timely notice of appeal.

## FACTS

This case involved the interactions between four people—defendant; his brother Eddie; a young woman named Sierra Berg; and Tyrod, the father of Sierra's son—during two separate but related events: a noninjury shooting that occurred around 6:00 p.m. on April 18, and a second shooting that occurred about seven hours later around 1:30 a.m. on April 19, in which Sierra was killed. Both events took place outside defendant's mother's house (the Zambrano home), which was located on the north side of the street, three houses east of the nearest intersection.

An apartment complex stood on the southwest corner of that intersection, where a witness (Neighbor 1) lived in an upstairs apartment. Robert and Robert's mother lived next door in the house west of the Zambrano home. A married couple (Neighbors 2 and 3) lived across the street from the Zambrano home. A young woman (Neighbor 4) lived across the street from and a few houses east of the Zambrano home.

Defendant and several family members were living in the Zambrano home at the time these events occurred. Defendant was staying in the converted garage; his mother, Eddie, and Eddie's son Vincent were living in the main house.

### Eddie and Sierra's Relationship

Eddie had known Sierra for about two years. They spent time together and had a sexual relationship, but Eddie did not consider them to be dating or in a relationship. He described their interactions as "just a sex thing." By April, Eddie wanted to stop seeing Sierra. He testified that Sierra would "go crazy, just go off," and that he "was trying to get away from her," but "she wasn't having it … [s]he wouldn't leave [him] alone." According to Vincent, who was in his early 20's, Sierra was always "causing a scene pretty much, yelling and stuff like that, arguing with [Eddie]." "[S]he brought a lot of

3.

drama and trauma around with her." For example, she once broke a window on one of Eddie's cars.

***The Early Part of April 18***

Sierra had spent the night at the Zambrano home over Eddie's objections. Early the next morning, around 7:00 a.m. on April 18, Tyrod picked her up so she could look after their son. Though not in a relationship, Sierra and Tyrod were friendly. Tyrod lived in Sierra's childhood home with their son and one other person, and Sierra would visit several times a week to babysit. Tyrod was now in a relationship with another woman. He was aware of Sierra's relationship with Eddie and knew Eddie had a brother, but he did not know defendant personally. At trial, Tyrod explained, "Sierra talks about them very vividly, the brother and him. She tells me everything. She tells me everything about them." Tyrod said Sierra had slept with both defendant and Eddie. But Sierra mentioned Eddie "[a]ll the time." According to Tyrod, "she kind of like was obsessed with seeing him. He—I don't think it was mutual. I don't think it was a mutual thing." Eddie was "the only person that [Sierra] loved and cared about. Her whole life was centered around Eddie."

When Tyrod picked Sierra up that morning, defendant was outside "patrolling in front of the [Zambrano home], walking back and forth." Tyrod thought defendant was "tweaking" like someone on methamphetamine and was acting "almost paranoid." After Tyrod dropped Sierra off at their house to watch their son, he went to school. Sierra was still there when Tyrod came home. He took a shower and fell asleep. While he was sleeping, Sierra took his car, a 2004 Kia, and left.

Meanwhile, Sierra and Eddie had been arguing about their relationship. Eddie received a call from Sierra at 1:20 p.m. and they talked until 2:06 p.m.[4] At 2:13 p.m., she

---

[4] Records of the calls and text messages extracted from Tyrod's, Sierra's, and Eddie's cell phones were admitted into evidence. The call records identify the date, time, source, and duration of the calls, but not their content. The text message records identify the date, time,

texted him, "Leave all my stuff outside…. Everything I ever gave you…. I want it all back." A minute later, she added, "I'm done with your ass for good… You don't care about me like that then I'm wasting my time." Then she added, "Or I will take your dog."

Tyrod learned that his Kia was missing when he woke up, at which point he "got upset" and started texting Sierra to bring it back. He sent his first text to her at 2:21 p.m.

Shortly after 3:00 p.m., Neighbor 1, who lived in the apartment complex near the Zambrano home, saw the Kia parked in front of her apartment complex with a woman inside. The Kia pulled away and circled the area three times, as if the woman was looking for someone.

At 3:24 p.m., Tyrod texted Sierra, "Im not mad just bring me my car and ill take you back over there .. Don't make me come get it." At 4:19 p.m., she responded, "Don't … I'm going to have almost full tank of gas and some cash for you," and "I'm not even driving…. Im with a date near river park." Tyrod continued to urge Sierra to return the Kia as soon as possible.

Eddie, who had been picked up by his boss a few hours after Sierra left that morning, finished work between 3:00 and 4:00 p.m. His boss then dropped him off at a food truck. He bought a burrito and walked home to eat. Sierra "kept calling and calling," so he told her he was still at work. Just before 4:30 p.m., she texted him that she wanted to talk and indicated she was at his house. He responded at 4:42 p.m., "Ur tripping, ok? I gota work stop calling me & take that car back.…" Sometime between 4:30 and 6:00 p.m., Eddie's friend "Rabbit" picked him up and drove them to a casino. Once at the casino, they split up to gamble.

---

source, and verbatim content of the text messages. Many of the text messages were also read into the transcribed record by Detective Loren Kasten at trial. There are some differences between the verbatim text messages and the text messages as read into the record by Kasten, mainly in spelling and punctuation. We use the verbatim text messages and note differences in the transcribed text messages where relevant or helpful.

*The Shooting at 6:00 p.m. on April 18*

At about 6:00 p.m., upset that Sierra was not responding to his texts, Tyrod used Uber, a rideshare service, to go to the Zambrano home to look for his Kia. When he arrived, he did not find the Kia or Sierra, but he saw defendant and another man, later identified as defendant's next-door neighbor Robert, standing in the front yard. The Uber driver parked between Robert's house and the Zambrano home, and watched as Tyrod walked behind the Uber and approached the two men.

Tyrod told defendant, "'Eddie better bring my car back. He and Sierra better bring my fucking car back.'" At trial, Tyrod acknowledged he argued with defendant and admitted he "wasn't nice." Defendant told Tyrod he did not know anything about the Kia, but he gave Tyrod Eddie's cell phone number. Tyrod saw a "'B'" tattoo on defendant's arm and thought Robert was "[a]nother Bulldog." Tyrod was scared so he pulled out a knife. He was five feet two inches from defendant when he pulled out the knife.[5] Tyrod testified, "I pulled it out, I stood there, and I said—told him to bring my car back." "I said, 'Where they at? I know you know where they at.'" Tyrod said, "'I know you know where she at. You are all fucking.'" Tyrod testified defendant was "a little more jittery, like—I don't know if he was on drugs." He was acting sort of like Sierra acted when she was on methamphetamine. Tyrod described defendant as "high, confused," and his behavior as "territorial." Tyrod told him, "'Bring my car back. Tell Eddie to bring my car back. I know you know where it's at.'"

At 6:10 p.m., Tyrod attempted to call Eddie, but he did not answer. Then, a minute later, Tyrod texted Eddie, "Im at your house i want my car now im a get serious."

---

**5**     The parties stipulated to this fact.

Tyrod got into the Uber and the driver started to drive away. Tyrod estimated they were 100 to 200 feet from the Zambrano home when he heard "gunshots."[6] Tyrod looked back and saw defendant holding something. He told police he could not be sure, but it looked like a shotgun. Tyrod testified, "I seen him holding something. I'm not too sure whether I throw the shotgun. I never seen him shoot at me. I can't say that he shot at me. But I know I heard shots. So I keep thinking back when he shot at me. I can't say I seen him shoot at me, but I turned around, I seen him there, so I figured, oh, he shooting at me. And then we drove off." He added, "I don't know what it was. I just speculated after that what it was. I had no idea what kind, what it was really."

The Uber driver testified that Tyrod talked with the men for "[f]ive to eight minutes" then came back to retrieve his cell phone from the Uber. After Tyrod talked with the men for "another two to three minutes," he came back "pretty quickly" and said, "'Drive.'" The driver said, "[T]hat's when I started looking back and I hear a gunshot and we drive off." They had "barely taken off" when he heard the gunshot "coming from that area, from the house." He asked Tyrod, "'Did they just shoot?'" Tyrod responded, "'Don't worry about it, because they're not going to shoot us.'" The shot did not hit the Uber or either man inside. The Uber driver testified he glanced back for "a couple seconds" and saw a man standing in the Zambrano home's driveway reaching toward the waistband of his pants. When asked if he saw a gun or firearm, the Uber driver said, "I did," but he never clarified what kind of weapon he saw. He said the man was "wearing glasses," had "light medium" skin tone, was "[p]robably [in his] 30s," and was wearing sweatpants and a white shirt.[7]

---

[6]     Tyrod stated he heard "gunshots," but the other witnesses reporting hearing only one gunshot.

[7]     A photograph of defendant was admitted into evidence at trial. Our review of that picture shows a man around 30 to 35 years of age with medium-toned skin color. We also note several witnesses identified defendant at trial as wearing glasses.

7.

When shown a photographic lineup by police, the Uber driver identified someone other than defendant, and he was also unable to identify defendant as the shooter at trial. Tyrod told police he did not threaten defendant, but admitted he might have said he would come back to the Zambrano home if his Kia was not returned. Tyrod also identified someone other than defendant out of a photographic lineup, though the officer who administered the lineup noted Tyrod only looked at it for "about 30 seconds" before making a selection. But at trial, Tyrod identified defendant as the person who shot at him and ultimately described their confrontation as "mutual combat"—"I beefed with him, we argued and that's what happened."

Neighbors 2 and 3, who lived across the street, also heard the gunshot. Both testified they were outside in the backyard around 6:00 p.m. when they heard it.

***Surveillance Video Footage of Defendant's Street at 6:00 p.m. on April 18***

During trial, the jury was shown surveillance video footage of defendant's street taken at 6:00 p.m. on April 18 and at 1:30 a.m. on April 19. The footage was obtained from two surveillance cameras located on the premises of the nearby apartment complex (where Neighbor 1 lived). One camera pointed northeast on defendant's street and showed the Zambrano home in the distance. The other camera pointed north on defendant's street and did not show the Zambrano home. The cameras were motion activated and only recorded when they detected movement. They did not record sound.

The video footage of defendant's street, taken at 6:00 p.m. when it was light outside, showed the apartment complex in the foreground and the Zambrano home in the distant background partially covered by trees. The camera's distance from the Zambrano home, the poor resolution, and the intervening tree cover affected the quality of the video and the discernibility of objects. In addition, because the camera was motion activated, there were gaps in the video footage when the camera was not recording.

Despite these limitations, the footage showed that at 6:10 p.m., a vehicle matching the Uber's description parked on the north side of defendant's street facing west, with the

Zambrano home just behind the vehicle. A man in dark clothing exited the front passenger seat and approached the Zambrano home, out of sight of the camera. At 6:13 p.m., a man walked from the driveway toward the Zambrano home. At 6:14 p.m., the man in dark clothing walked toward the street, got into the waiting vehicle, and the vehicle drove away a few seconds later. Movement then occurred in front of the Zambrano home. A man wearing a white shirt walked due west, toward Robert's house, and disappeared off the screen. Another man, also wearing a white shirt, walked around the driveway, then stepped into the street and faced west, in the Uber's direction. In that position, only his dark pants were visible; his hands and upper body were obscured by a tree. After about three seconds, the man turned around and walked back to the Zambrano home.

### *The Evening of April 18*

At 6:14 p.m., Tyrod texted Eddie, "So ur brother shooting at me ok." Twelve minutes later, at 6:26 p.m., Tyrod texted Sierra, "Ok see now u got mfs shooting at me .. U a fucked up person."

At 6:32 p.m., Tyrod texted Eddie, "Ya better give me back my car," then he attempted to call Eddie again. At 6:33 p.m., Eddie responded to Tyrod, texting, "Whos this what r u talking. abt" Tyrod answered, "Your brother shot at me .. Sierra told me ya together riding around in my car .. U think im a sucker … I should bring the police to ur house .. But im a street nigga so u trying play games .. That's fucked up cause i respected ya relationship n u tried me like im a punk." At 6:41 p.m., Eddie responded, "Cheeck this out homie I aint wit sierra so u need to chill the fuck out… Shes own her own Im at work dog." He added, "I dont play games dog. U need to check her ass im just her friend. So if I see her Ill call u up."

At 6:55 p.m., defendant attempted to call Eddie. Less than a minute later, Eddie called Rabbit.[8] At 6:57 p.m., Eddie texted Rabbit, "Wevneed to go my brother is shooting at people."

At 7:00 p.m., defendant texted Eddie, "A mother fucker a jest shoot at did fucken nigga came over tripping and pulled a knife in me and shot at hiim u better get here now."[9] A few minutes later, Eddie responded, "What nigger… Ok im wit rabbit let me go get em ill be overthere." Eddie called Rabbit again. Defendant answered Eddie's text, "Your Fat ugly lil bitch boy friend," followed by, "He side he be right back." Then defendant added, "Tell mom not to com home my phone don't fucken call," and "Tell Conjo bring it hrery Da Fuck up!!!!!"[10]

At 7:15 p.m., Eddie texted Tyrod, "Dnt go to my momz house like that homeboy u should of asked me b4 u went overthere, I dnt want no problems but we could get bizzy if it cumz down to it. I had nothing to do wit what sierra did.… My brother is not going to put up wit shit like that."[11]

At 7:30 p.m., defendant attempted to call Eddie again. At 7:39 p.m., Eddie texted defendant, "This fuck is taking his sweet time im trying to get over there."

Sierra continued texting Eddie. Between 7:33 and 7:38 p.m., she texted him: "Answer the fuxking phone before there is war," "I'm not going to bring the car back,"

---

[8]     The call and text message records identify Eddie's cell phone contact of this person as "Conejo," the Spanish word for "Rabbit."

[9]     Kasten read this text message into the record on two occasions, as follows: "A mother fucker a jest shoot at did fucken nigga came over tripping and pulled a knife in me and shot at him. You better get here now." "'Hey, mother fucker. He jest shoot at did fucken nigga. Came over trippin' and pulled a knife in me and shot at him. You better get here now.'"

[10]     Kasten read this text message into the record as follows: "'Tell Conejo bring it, hurry da fuck up.'"

[11]     Kasten read this text message into the record as follows: "' Don't go to my mom's house like that, homeboy. You should have asked before you went over there. I don't want no problems. But we could get busy if it comes down to it. I had nothing to do with what Sierra did. My brother is not going to put up with shit like that.'"

10.

"And now your brother and my babydad have beef," and "And I wasn't even at your fucking house." She added, "I swear to god Eddie Andre the fucking phone or I'm coming bqck over and I'm going to have problems with lyles."[12]

At 7:38 p.m., Tyrod texted Eddie, "Can u please tell her to bring my car back and u will talk to her … for me please." Eddie said he would and added, "Just stay away from my momz hiuse thats all i ask."

Between 7:30 and 8:00 p.m., Eddie received 15 calls from Sierra; he answered only one. Sierra texted Eddie between 7:39 and 7:42 p.m., stating, "Eddie why are you ignoring me," "I'm going to your house screaming right now," and "I'm hiding the car and there is gonna be some beef all cause you can't anwser."

Around this time, neighbors saw Sierra near the Zambrano home. Neighbors 2 and 3 testified they went for a walk around 7:00 p.m. and saw Sierra in the Kia outside their house. Neighbor 2 (the wife) said Sierra was inside the Kia and appeared to be arguing with someone. Neighbor 3 (the husband) saw Sierra in the Kia and heard her yelling and arguing in English. She appeared to be by herself and yelling at someone inside the Zambrano home.[13]

Neighbor 4 testified she heard a disturbance between 7:45 and 8:05 p.m. when she was home on her lunch break. When she arrived home, she heard screaming, fighting, and arguing near the Zambrano home, and she saw what looked like a woman "getting kicked out of the house." The argument sounded physical; she heard "some hits," and the woman was "screaming" and "retaliating." The woman had dark hair and was wearing

---

[12]    Sierra apparently misspelled "Liyo," which was defendant's nickname. The two names were apparently pronounced similarly; we note that the trial court asked the prosecutor during examination, "Counsel, to be sure, are you saying Lyle, L-y-l-e, or L-i-y-o?" The prosecutor answered, "L-i-y-o."

[13]    Neighbor 2 identified the vehicle as the Kia when she testified it was the same vehicle she later saw when the police arrived (around 1:30 a.m.). Neighbor 3 identified the woman as Sierra when he identified her as the same woman he later saw being loaded into an ambulance.

11.

shorts and a top with spaghetti straps, which matched Sierra's description. Neighbor 4 told police she heard a man yell, "'Bitch, get out of my house.'" She also told police she saw a man wearing a beige, long-sleeved shirt. When she left her house to go back to work, she did not see the woman.

At 7:42 and 7:48 p.m., defendant texted Eddie, "I only. Got 4 shell. Mother fcker," and "Thare 4 cars serqel mom's house u bitches."[14]

At 7:56 and 7:57 p.m., Sierra texted Eddie, "OK you can't anwser so I parked the car in front of your house and I'm walking away," and "Okay Eddie I have no choice but to leave the car here and let my bd just handle it."[15]

At 7:58 p.m., Eddie texted defendant, "Nobodys going overthere ok I got a hold of this nigga he dnt want none ok let me get home ill handel it ok.."[16] At 8:10 p.m., Eddie missed defendant's call. At 8:10 and 8:11 p.m., Eddie called defendant and they spoke for four seconds each time.

At some point, Eddie and Rabbit left the casino and headed home. Rabbit testified Eddie seemed upset and "[p]issed off." Eddie told Rabbit he had to go home because defendant was causing problems at home.

At 8:12 p.m., Vincent called Eddie and they spoke for 49 seconds. Then, at 8:15 p.m., Vincent texted Eddie, "Liyo's all mad be careful he might try something." Vincent sent the text message as a warning so Eddie would not be surprised by "anything he didn't expect" when he came home. Vincent told police he heard defendant say,

---

**14** Kasten read these text messages into the record as follows: "'I only got four shell, mother fucker,'" and "'They're four cars circling mom's house you bitches.'"

**15** Presumably, "bd" refers to "baby daddy."

**16** Kasten read this text message into the record as follows: "'Nobody's going over there, okay? I got ahold of this nigga. He don't want none. Okay? Let me get home. I'll handle it, okay?'"

12.

"'Your fucking—your dad's bitch came through with some … n-i-g-g-e-r looking for a car and pulled a knife on me.'"

At 8:16 p.m., Eddie texted Tyrod, "A dog im abt to pull up to my house sierra is hiding and im going to find out where shes at. Thiz is a big fuckn mess but its going to get fixed…."[17] Tyrod answered, "Ok thank u."

When Eddie got home from the casino, he and defendant got into an argument. Vincent left the house because defendant and Eddie were arguing. He did not want to be present for that, so he went to a friend's house. Vincent heard about the incident between defendant and "some black guy earlier in the day," but he was not there when it occurred.

Between 8:00 and 10:00 p.m., Sierra called Eddie 14 times. He answered a few of those calls and called her another three times. Sierra drove the Kia to a friend's house between 8:00 and 9:00 p.m., and the friend overheard one of the phone calls between Sierra and Eddie; Sierra wanted to come over but Eddie did not think it was a good idea. Sierra was at the friend's house in the early evening and then again later until 1:08 a.m., according to the home's security video. While she was there, she spent a lot of the time on the phone. Another person at the friend's house heard Sierra say on the phone, "'You think me throwing that brick through a window was bad, mother fucking, you haven't seen nothing. I will be there in five minutes.'"

Vincent texted Eddie at 8:59 p.m. and asked, "Is everything ok[?]" He testified, "I wanted to make sure it was all right. I didn't want to come home and break up no fight or nothing." At 9:38 p.m., Vincent called Eddie.

At 9:54 p.m., Eddie texted Tyrod, "Where r u at? I got her to give it bk too u…" Tyrod responded with his location.

---

**17** Kasten read this text message into the record as follows: "'Hey dog, I'm about to pull up to my house. Sierra is hiding and I'm going to find out where she is at. This is a big fucking mess but its going to get fixed.'"

13.

Vincent returned home around 10:00 or 11:00 p.m. It was late, the house was quiet, and he did not see anyone. He thought his grandmother's television was on in her room. Her light was off, but she always had her television on when she went to sleep. Vincent lay down on the couch in the living room where he usually slept.

At 10:04 p.m., Eddie texted Sierra, "Call me when ur down the street ok dnt cum over here ok…"[18]

At 10:05 p.m., Eddie texted Tyrod, "Shes going to tell me where the car is going to be then ill let u now shes scary right now r we good or what?" At 10:06 p.m., Tyrod answered, "Yeah we good .. My bad for comong to your house like that ..I was mad and not thinking clear." At 10:09 p.m., Eddie responded, "Its all good I would of been heated too, so shes taking it now so be ready to fly…." Tyrod texted, "Ok … Where is she going leave my keys[?]" Eddie answered, "I ll tell her to put them under the P/S seat…." Tyrod answered, "Ok."

At 10:11 p.m., Eddie made a 17-second call to defendant. Then, at 10:17, Sierra called Eddie and they talked for 46 minutes.

Tyrod continued texting Sierra to bring his Kia back. She texted that she was going to bring the Kia back, but then she texted that she was mad at Tyrod for going to the Zambrano home. She thought she and Eddie would no longer be together because Tyrod went over there. She blamed Tyrod for the problems she was having with Eddie, telling Tyrod it was his fault the man she loved did not want anything to do with her. Tyrod repeatedly told her he wanted his Kia back.

At 10:43 p.m., Tyrod texted Eddie, "Wat happened[?]" A minute later, Eddie answered, "A dog shes going to tex u, right now shes on a power trip or smth.…"[19]

---

**18**     Kasten read this text message into the record as follows: "'Call me when you're down the street, okay? Don't come over here, okay?'"

**19**     Kasten read this text message into the record as follows: "'Hey, dog, she's going to text you. Right now she's on a power trip or something.'"

14.

At 10:56 p.m., Sierra texted Tyrod, "I'm not returning your car right now because you took away the only person I felt like I had in my life and now he doesn't want to see me…. You fucking asshole I always return your car and now you took away something important to me so im doing the same." He responded, "Bring me my car now while im not upset." At 11:05 p.m., Sierra wrote, "OK but I want to die." Tyrod texted, "Your okay eddie is cool." She replied that Eddie said she "can't go back over ever again."

At 11:20 p.m., Eddie texted Sierra, "Sierra whats wrong wit u man[?]" She responded, "Im a fucken loser, I have no talents, I hate everyone ND everyone hates me…I don't make the right decisions and I smoke Meth…. That's what's wrong with me." Half an hour later, she texted him, "I just need to fuck then we can go our separate ways."

***Sierra's Death on April 19***

At 11:55 p.m., Eddie answered a call from Sierra and they talked for two minutes 29 seconds. He missed the next three calls from her, then answered one at 12:21 a.m. and they talked for one minute 25 seconds. He answered the next three calls from her at 12:45 a.m., 1:00 a.m., and 1:21 a.m., and they talked for a total of about 35 minutes. Then he missed five calls from her. At 1:29 a.m., he answered her call and they talked for 47 seconds. Then, about two minutes later, at 1:31 a.m., he called her and they talked for 15 seconds for the last time. There were no text messages between them recorded during this time.

Around 1:30 a.m., neighbors heard three gunshots. Neighbor 1 was awake in her living room when she heard "what sounded like someone yelling." She could not make out what was being said. She told police that she heard one gunshot followed by a woman screaming, and then two gunshots in quick succession.

Neighbors 2 and 3 were awoken by the three gunshots.

Neighbor 4 was in her bedroom when she heard the three gunshots, each separated by one or two seconds. She told police that after she heard the three gunshots, she went

15.

out to the edge of her house to see what was going on down the street. She heard four voices, one of whom was a man who yelled, "'Get out of my house.'" She heard a woman screaming as though someone had been hurt, so she called 911. While she was on the phone with 911, she heard the woman scream "Liyo" twice. She saw a man wearing a white, long-sleeved shirt standing on the west side of the Zambrano home, and she assumed this was the same man she had seen during her lunch break (around 7:45 p.m.). Of the four people she heard, he was the "most animated and yelling the most profanities and made that statement." When she heard sirens and the police started to arrive, the man disappeared from view. She assumed he went back into the house or down the west side of the house.

Eddie testified he heard the gunshots and ran outside. He saw Sierra injured and bleeding inside the Kia. He denied seeing anyone else outside or seeing anyone shoot Sierra. He called 911 and put pressure on Sierra's wound with his hands until help arrived. According to cell phone records, Eddie called 911 at 1:33 a.m., about one minute after his last call with Sierra ended.

Vincent testified he was "halfway asleep" on the couch in the living room when he heard two or three loud bangs. He went out the front door where he saw "a car up on the curb and … [his] dad on the phone already, calling for [an] ambulance, [saying] somebody got shot." Before he walked outside, Vincent did not notice anyone exit the Zambrano home through either the front or back door.

Police were dispatched to the scene at 1:35 a.m. Upon their arrival, Sierra was "gasping for air, heavily bleeding from her face and neck area, [which] was completely covered in blood." Officers observed Eddie "attempting to provide medical aid." They described him as a "Hispanic male with a shaved head, wearing a white shirt and red shorts." Eddie was crying and seemed distraught. He flagged an officer over. Officers took over rendering assistance until medical personnel arrived. When asked "if he knew what happened," Eddie told police, "'No, no, nah,'" He said he did not know who shot

16.

Sierra, but he told her not to come. He said they had been arguing because she had taken Tyrod's Kia, and she told Eddie she was going to come to the house and "cause some shit." Eddie said he lived with his mother and two sons; he did not mention defendant. He said he was inside waiting for Sierra because she told him she was coming, and then he heard two loud shots. He left the house and saw the Kia traveling slowly at an angle toward his house. He realized it was Sierra and he tried to render aid. She was not responsive.

Sierra was transported to the hospital where she died of a shotgun wound to the head.

### Surveillance Footage of Defendant's Street at 1:30 a.m. on April 19

Video footage from the two cameras, taken around 1:30 a.m. when it was dark, was shown to the jury. In footage from one camera, a car appearing to match the Kia's description drove back and forth several times on defendant's street. The car drove west away from the Zambrano home at 1:23 a.m., then drove east toward the Zambrano home at 1:24 a.m.; the headlights were on. The car then drove west again at 1:31 a.m., and drove east at 1:32 a.m.; the headlights were off.

In footage from the other camera, a car turned south off of defendant's street at 1:28 a.m.; the headlights were on. At 1:33 a.m., headlights flashed on and off repeatedly for about thirty seconds, apparently coming from a stationary car (which was not visible) facing east on defendant's street toward the Zambrano home. At 1:38 a.m., a vehicle with a searchlight drove past the Zambrano home.

### Police Investigation

When the police arrived, they found the Kia stopped near the border of Robert's house, angled northeast toward the Zambrano home. Three wheels were on Robert's front lawn and the rear passenger's side wheel was on the road. Robert's mailbox was pinned underneath the Kia. The engine was running, the gear was in drive, and the headlights were off. The rear window was broken out, and there was gunshot damage to

17.

the windshield, the driver's door, and the front driver's side quarter panel. All of the windows were down except the rear driver's side window.

Photographs of the scene depict a number of items in front of the Zambrano home, including various household goods and several parked cars. The west side of the Zambrano home, close to where the Kia came to rest, was partially bordered by a fence "five to six feet tall." When asked what was significant about this particular area, Detective Kasten testified, "What I noticed is that fence is probably five to six feet tall and there's a tree a couple feet away from it. And if you were standing east of that fence or of that tree, it would conceal you from people looking east, from the west." Kasten noted defendant's backyard could be accessed through a gate on the west side of the Zambrano home.

Three expended 12-gauge shotgun shells were found about 80 feet due east of the Kia, near a line of shrubs on Robert's front lawn. One live 12-gauge shotgun shell was located on the ground near the Kia's driver's door.

Defendant, who had refused to leave the garage, was finally arrested and taken into custody around 7:00 a.m. At the time he was taken into custody, his pants were "down low"—"[h]is boxers were on and then his pants were falling down to his ankles."

Police executed a search warrant on the garage of the Zambrano home where they collected a black nylon handgun holster and a gray camouflage magazine pouch from the ceiling inside the garage. The holster was for a handgun, but no such weapon was found. Three live shotgun shells and one spent shell were also recovered from a dresser in the garage.

Police found a J.C. Higgins pump-action shotgun in a shed located in the backyard of the Zambrano home.[20] The shotgun was approximately 27 inches long in total, with a shortened, sawed-off barrel that measured 16½ inches. A string had been threaded

---

[20] Kasten testified that Vincent told him the items in the shed belonged to defendant.

18.

through a hole in the butt of the weapon and around the barrel, then tied into a loop. Based on our review of photographs of the shotgun, the string measured approximately 50 inches in total length and created a strap about half that length.

Ballistics determined the three expended shotgun shells recovered near the Kia had been fired from that shotgun, and the live shell had been cycled through and ejected from the shotgun, as well. Two fingerprints were found on the shotgun near the trigger and pump-action lever, both matching defendant's left middle finger. Gunshot residue (GSR) was found on defendant's left hand. GSR was also found on Eddie's right hand.[21] Defendant's DNA was found on the shotgun, but Eddie's was not.

In June, Kasten interviewed Eddie again. There were certain topics Eddie was reluctant to talk about. For example, he was reluctant to answer when Kasten asked if he was outside when Sierra was shot and if defendant shot Sierra.

### Defense Evidence

Another neighbor, Neighbor 5, testified she heard two people argue for five to 10 minutes in the early morning hours of April 19. They were "telling each other off" and one was telling the other to be quiet. She heard the phrase, "'Shut the fuck up.'" She could not tell if the voices were both male, or male and female. She did not remember telling police she heard two male voices. She heard three gunshots and then the argument ended. She did not call 911 because she was scared.[22]

Robert testified he had been defendant's next-door neighbor for 20 years. On April 18, around 6:00 p.m., he was talking with defendant outside the Zambrano home when a black man he had never seen suddenly appeared, wielding a knife and threatening

---

[21]    At trial, the criminalist who ran the GSR tests testified that it is possible for a person to get GSR on their hands by touching the victim of a gunshot wound. Eddie used his hands to put pressure on Sierra's wound.

[22]    At trial, Neighbor 5 was assisted by a Spanish interpreter and said she understood "[v]ery little" English.

19.

defendant.  The black man said, "'You know what, I better get my car back or I'll be back tonight.'  He said I won't be coming by myself, in other words."  The man did not swing at or stab Robert or defendant.  Then Robert went home.  He denied hearing gunshots or seeing anyone shoot at the black man.  He testified the black man was the only person with a weapon.

When questioned by defense counsel, Robert admitted he "probably" told police he did not want to get involved and "might have" said this because he feared repercussions if he went to court.  But he denied telling police, "'I told you all I know, that is all I can tell you.  I don't want my mom to get hurt.'"

### *Rebuttal Evidence*

Kasten was called by the prosecution as a rebuttal witness.  When Kasten spoke with Robert about the shooting, he "was not very cooperative" at first.  Kasten testified, "I asked him about what had happened on the previous day around 6:00 p.m.  He told me he did not want to get involved.  He told me he was concerned about his mom who lives there and the fact that he didn't want the house to get shot up.  And he made the quotation, 'I know how they are.'"  Kasten understood that Robert was referring to defendant and Eddie.  Kasten asked Robert if he really believed the black man was going to come back with people, to which Robert responded, "'I don't think so.'"  Robert then became uncooperative again and said, "'You don't have to live here, I do.  I don't know.'"

**DISCUSSION**

## I.    Sufficiency of the Evidence

Defendant contends insufficient evidence proved he assaulted Tyrod with a firearm at 6:00 p.m. because nobody saw him with a gun, he did not have the opportunity to get a gun, there was no physical evidence that a gun was fired, and there was no evidence of any kind that defendant (or anyone) "actually" fired a weapon "'at'" Tyrod.  The People respond that "[t]he testimony of multiple witnesses who heard a gunshot, as

20.

well as evidence of contemporaneous texts … stating that [defendant] shot at [Tyrod] constituted ample evidence to support the jury's verdict." We agree with the People.

## A. Law

Defendant was convicted of assault with a firearm under section 245(a)(2).[23] "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) The gravamen of a criminal charge under section 245(a)(2) is, simply put, that the defendant consciously acted in a manner likely to harm another person and used a firearm to do so. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1734.)

"When a criminal defendant challenges the sufficiency of the evidence in support of a conviction, the reviewing court's task is to determine whether, in light of the whole record viewed in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.) We presume every fact that could reasonably be deduced from the evidence and make all reasonable inferences that support the judgment. (*People v Johnson* (1980) 26 Cal.3d 557, 576–577.) We evaluate "'the entire picture of the defendant put before the jury'" to determine whether each element was supported by substantial evidence. (*Id.* at p. 577.) Substantial evidence is that which is "'of ponderable legal significance,'" meaning it is "'reasonable in nature, credible, and of solid value.'" (*Id.* at p. 576.) Applying these principles, we uphold the judgment if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*Ibid.*; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

---

[23]     Section 245(a)(2) provides: "Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not less than six months and not exceeding one year, or by both a fine not exceeding ten thousand dollars ($10,000) and imprisonment."

The standard of review is the same regardless of whether the conviction was mainly supported by circumstantial evidence. (*People v. Story* (2009) 45 Cal.4th 1282, 1296.) While the jury must acquit if circumstantial evidence can be interpreted two different ways, "'''"one of which suggests guilt and the other innocence,'''" it is the jury that must be convinced of defendant's guilt, not the appellate court. (*Ibid.*) When the jury's findings are reasonably supported, reversal is not warranted. (*Ibid.*)

**B.     Analysis**

Mindful of these standards, we examine the record to identify the evidence supporting the elements of the crime, which are (1) the defendant performed an act with a firearm that, by its nature, would directly and probably result in the application of force to a person; (2) the defendant performed that act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to conclude that the act, by its nature, would directly and probably result in the application of force to a person; and (4) when the defendant acted, he had the present ability to apply force with a firearm to a person. (See CALCRIM No. 875.) Defendant challenges only the first element on appeal, arguing he did not shoot at Tyrod. Thus, we focus our discussion on the first element and discuss the other three only briefly.

**1.     Element One**

To satisfy the first element, that defendant performed an act with a firearm, the prosecution alleged defendant shot a firearm at Tyrod at 6:00 p.m. Proof of this element depended largely on circumstantial evidence because no one was injured, no one testified to seeing the shooting, and there was no physical evidence such as spent shells or bullet holes. The strongest piece of evidence that defendant shot at Tyrod was defendant's text message to Eddie stating, "A mother fucker a jest shoot at did fucken nigga came over tripping and pulled a knife in me and shot at hiim u better get here now." The prosecution relied on this text message as defendant's admission that he shot at Tyrod.

22.

On appeal, defendant argues this text message "was gibberish and too vague and ambiguous to constitute evidence that he [shot at Tyrod]." Defendant says the text message did not specify who committed the shooting and "it cannot be inferred that [he] meant to convey he or anyone had committed a shooting .…" He claims that drawing any inference from this text message "would require speculation and guessing regarding what he meant to communicate." The People, on the other hand, continue to argue that the text message was defendant's admission that he shot at Tyrod.

We conclude that, while the text message certainly was rife with "spelling errors and syntactical deficiencies," as defendant puts it, the jury was entitled to, and impliedly did, find the text message to be defendant's admission that a black man "came over tripping and pulled a knife" and that defendant "shot at hiim" in response, as the People argue.[24] As we will explain, substantial evidence supported this reasonable inference.

First, although defendant did not clearly identify himself as the shooter in the text message, he did not identify anyone else as the shooter, and the evidence supported the inference that he was in fact referring to himself. We believe the jury could reasonably have concluded that defendant's text message—"A mother fucker a jest shoot at did fucken nigga came over tripping and pulled a knife in me and shot at hiim u better get here now"—meant "Hey, mother fucker, I just shot at this fucking black man who came over tripping and pulled a knife on me and I shot at him. You better get here now." Kasten interpreted "A mother fucker" as "Hey, mother fucker" when reading this text message at trial. He similarly interpreted "A dog" as "Hey, dog" when reading text

---

**24** "An admission as applied to criminal law is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt." (*People v. Ferdinand* (1924) 194 Cal. 555, 568.) A confession, on the other hand, "is a statement which admits the crime and leaves no room for any inference other than that of defendant's guilt." (*People v. Polite* (1965) 236 Cal.App.2d 85, 89.)

23.

messages from Eddie to Tyrod. [25] This supported the inference that defendant used "A mother fucker" as something of a greeting directed at Eddie, meaning "Hey, mother fucker," rather than as a description of the shooter. Further, the jury could reasonably have concluded that "did" (as used in "did fucken nigga") was a misspelling of "dis," meaning "this," and that "and shot at hiim" was a reference to something defendant himself did, not someone else.

This interpretation of the text message, that defendant referred to himself as the shooter, was also supported by evidence of the events. Tyrod, a black man, went to the Zambrano home, pulled out a knife, and "beefed" with defendant. Defendant's demeanor—his "patrolling" and "almost paranoid" behavior that morning and his "territorial" and "jittery" behavior at 6:00 p.m.—supported the inference that he may have been on drugs, paranoid, and generally prepared for trouble. Tyrod was scared because he thought defendant and Robert were gang members, so he pulled out a knife. As he left in the Uber, he heard a gunshot. When he turned around, he saw defendant holding "something" that looked like a shotgun. While Tyrod was not certain he saw a shotgun, his testimony was still probative and the jury was entitled to consider it in light of the other evidence. (See *People v. Hines* (1997) 15 Cal.4th 997, 1058 ["Shotguns are sufficiently within common experience" for lay witnesses to testify about them at trial].) Tyrod concluded defendant shot at him. He sent text messages to that effect, telling Sierra, "[S]ee now you got mfs shooting at me," and telling Eddie, "Your brother shot at me."

The Uber driver testified similarly, stating that he was driving away from the Zambrano home when he heard the gunshot. He looked back and saw a firearm and a man reaching toward the waistband of his pants. Although the driver never specifically

---

**25** "A dog im abt to pull up to my house sierra is hiding and im going to find out where shes at. Thiz is a big fuckn mess but its going to get fixed," and "A dog shes going to tex u, right now shes on a power trip or smth.…"

24.

stated the man was *holding* the firearm, that was a reasonable interpretation of his testimony and the jury was entitled to draw that conclusion. He described the man as in his 30's, wearing glasses, with "light medium" skin, and "[p]robably" wearing a white shirt and sweatpants. This was consistent with defendant's age and skin color as shown in a photographic exhibit, and with testimony at trial identifying defendant as wearing glasses. The video footage confirmed that a man wearing a white shirt was standing in the street in front of the Zambrano home around 6:00 p.m.[26]

Robert testified he was talking with defendant outside the Zambrano home when a black man suddenly appeared, wielding a knife and threatening defendant. According to Robert, the black man said, "'You know what, I better get my car back or I'll be back tonight.' He said I won't be coming by myself, in other words." Robert denied seeing or hearing a gun fired. However, the jury was entitled to disregard or discount his testimony on this matter in light of rebuttal evidence offered by Kasten, who interviewed Robert after the incident. Kasten testified Robert "was not very cooperative" and said "he did not want to get involved" because "he was concerned about his mom who lives there and the fact that he didn't want the house to get shot up. And he made the quotation, 'I know how they are.'" From this, the jury could reasonably have inferred that Robert lied about seeing or hearing defendant fire a gun because he was afraid defendant would retaliate against him and his mother.

Furthermore, there was no evidence that anyone other than defendant and Robert were outside at the time of the shooting. And there was no suggestion, by the prosecution or the defense, that Robert was responsible for the shooting. Robert acknowledged he

---

**26** Defendant notes the Uber driver "was unable to identify [him] as the person he supposedly saw with a gun." However, while the driver failed to positively identify defendant in court or when shown a photographic lineup by police, he nevertheless provided a physical description that was consistent with defendant's characteristics. The weight and significance of his testimony, if any, was a matter for the jury to resolve. (*People v. Casares* (2016) 62 Cal.4th 808, 823–824, disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

was present when Tyrod and defendant were arguing, but he never mentioned participating in the argument or engaging with Tyrod in any way. Tyrod's testimony similarly never mentioned any interaction with Robert. The logical inference was that defendant was the shooter described in the text message. Though the jury could have found otherwise, the evidence did not require them to do so and our role on appeal is neither to reweigh the evidence nor to reevaluate witness credibility. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

The physical evidence also supported the interpretation of the text message that defendant referred to himself as the shooter. Police retrieved a pump-action, sawed-off shotgun from a shed in the backyard of the Zambrano home that contained defendant's property. The shotgun had defendant's DNA and fingerprints on it. Ballistics proved the shotgun was used to shoot and kill Sierra about seven hours after defendant's argument with Tyrod. Inside defendant's room in the garage, police recovered three live shotgun shells and one spent shotgun shell. They also retrieved a handgun holster and magazine pouch from the ceiling inside the garage, though no handgun was found. This evidence permitted the reasonable conclusion that defendant had access to at least one operable weapon—the shotgun—at the time the assault occurred, which corroborated Tyrod's testimony that he saw defendant holding "something" that looked like a shotgun. The jury could also have inferred that defendant additionally possessed an unrecovered handgun fitting the holster found in his room.

Defendant argues the Uber driver must have seen a *handgun* because a shotgun would have been impossible to hide in the waistband of the shooter's pants and, therefore, the Uber driver's testimony cannot be reconciled with Tyrod's belief that he saw a shotgun. The evidence did not require such a finding. The shotgun that police recovered had a shortened barrel and the gun measured 27 inches in total. A piece of string had been tied into an improvised strap. The jury could reasonably have inferred that the barrel had been sawed off to make the weapon easier to conceal, and that the

strap was intended to facilitate the same purpose. A weapon of this size could potentially have been tucked into the waistband of the shooter's pants—especially baggy pants—while strapped over a shoulder, and hidden by pulling a shirt over it. The Uber driver stated the shooter was wearing sweatpants, and police testified that when defendant was arrested, his pants were so loose that they "were falling down to his ankles," which supported the inference that defendant's pants were baggy enough to conceal either a handgun or a sawed-off shotgun.

And even if defendant did not have the weapon on his person during the argument with Tyrod, there were a number of places he could have hidden a weapon for quick access outside the Zambrano home, such as several parked cars, the fence line, shrubbery, and piles of household goods. Indeed, the video footage showed two men in white shirts moving around in front of the Zambrano home as Tyrod was leaving in the Uber. One of the men walked directly toward Robert's house, and it would have been reasonable for the jury to conclude this was Robert walking home. The other man walked around the driveway, then stepped into the street to face the Uber's direction for a few seconds before going back to the Zambrano home. The jury could reasonably have concluded this person was defendant and he had the opportunity to retrieve a hidden weapon and shoot at the Uber as it was driving away. Although defendant's upper body cannot be seen on the video due to tree cover, this inference would have been reasonable based on the testimony of Tyrod and the Uber driver.

Thus, the weapon descriptions offered by Tyrod and the Uber driver were not so inherently contradictory as to require them to be rejected in light of the shotgun's size and strap, the description of defendant's pants, and the video footage showing that defendant had the opportunity to pick up a hidden weapon and step into the street to shoot it. (*People v. Huston* (1943) 21 Cal.2d 690, 693 [collecting cases], overruled on other grounds in *People v. Burton* (1961) 55 Cal.2d 328, 352.)

27.

Defendant argues that nothing proved a gun was actually discharged because "[t]he sound itself did not definitively establish that a gun had been fired, especially given the absence of testimony that any of the people who heard it had the training or experience to distinguish a gunshot from another similar sound, such as a car backfire." But defendant never objected when Tyrod, the Uber driver, Neighbor 2, and Neighbor 3 testified to hearing the gunshot at 6:00 p.m. "Because defendant failed to object to the testimony of these witnesses at trial, he is barred from challenging it on appeal." (*People v. Hines*, *supra*, 15 Cal.4th at p. 1058.) Furthermore, Neighbors 2 and 3 accurately identified the gunshots at 1:30 a.m. when Sierra was shot and killed, and there was no reason to believe they lacked the expertise to identify the gunshot at 6:00 p.m.

In light of all the evidence—including Tyrod's belief that he saw defendant holding something that looked like a shotgun, the Uber driver's testimony that he saw a firearm, defendant's possession of an operational shotgun and ammunition, the video footage showing defendant's movements before the shooting, and Kasten's interpretation of the text message language—it was reasonable for the jury to conclude the text message was defendant's admission that he shot at Tyrod. This admission, together with the other evidence, constituted sufficient evidence to satisfy the first element.

### 2. Element Two

As for the second element, that defendant performed the act willfully, no evidence suggested defendant shot at Tyrod accidentally, by mistake, or under circumstances indicating anything other than purposeful conduct. "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act …." (§ 7, subd. (1).) "It does not require any intent to violate law, or to injure another, or to acquire any advantage." (*Ibid.*) The mens rea of assault is thus supported by proof a gun was deliberately fired in the direction of another, rather than by accident or mistake. (*People v. Herrera* (1970) 6 Cal.App.3d 846, 851.) Here, defendant's text message that he "shot at hiim" supported the inference that he shot

in the direction of Tyrod, and the circumstances described above suggested he felt threatened by Tyrod and purposely fired in retaliation.

### 3. Element Three

The third element, that when defendant acted, he was aware of facts that would lead a reasonable person to realize the act, by its nature, would directly and probably result in application of force to a person, was also supported.  This element is judged under an objective standard, so the question was whether a reasonable person, knowing what defendant knew, would have realized the act carried an attendant risk of harm.  (*People v. Williams* (2001) 26 Cal.4th 779, 789–790.)  Deliberately firing a loaded weapon *at* someone certainly satisfies this objective test, as does aiming a warning shot in the "near vicinity" of where the shooter knows another person to be.  (*Id.* at p. 790.)  Thus, when defendant deliberately fired the weapon at Tyrod, he was aware of facts that would lead a reasonable person to understand his act carried with it an attendant risk of harm.

### 4. Element Four

The fourth element, that when defendant acted, he had the present ability to apply force to a person, asks whether the defendant "'has attained the means and location to strike immediately.'"  (*People v. Chance* (2008) 44 Cal.4th 1164, 1168.)  The present ability to apply force exists when the defendant fires "rounds from a fully operational, loaded gun in the direction of the victim who was 'easily within striking distance.'"  (*People v. Licas* (2007) 41 Cal.4th 362, 369.)  The facts here showed that when defendant fired, he possessed an operational shotgun and ammunition, it was still daylight, and the Uber (with Tyrod inside) was only 100 to 200 feet away.  This evidence satisfied the fourth element.

### 5. Conclusion

Accepting all logical inferences the jury might have drawn from the evidence, we cannot say "'that on no hypothesis whatever is there sufficient substantial evidence to

29.

support the verdict .…'"  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

Defendant's conviction for assault with a firearm must therefore be affirmed.

## II.    Instructional Error

Defendant's second contention on appeal is that the trial court erred in failing to instruct the jury on the heat of passion theory of manslaughter.  Although the jury was instructed on imperfect self-defense, the court declined to instruct on heat of passion manslaughter.  Defendant argues this constituted reversible error because the prosecution's case-in-chief included the facts necessary to show that he shot Sierra while in a state of hostile and violent agitation.  The People respond the evidence did not support such an instruction.  We agree with the People.

### A.    Background

Following the conclusion of evidence, the trial court held a jury instruction conference.  Defendant asked for an instruction on heat of passion as set forth in CALCRIM No. 570.  The trial court declined, explaining:

> "The Court, upon further reflection of the testimony that was actually presented during the course of the trial, concluded that it would not be appropriate to give [CALCRIM No.] 570 because there was insufficient evidence that [Sierra] did anything that provoked the defendant in any way immediately before the shooting, nor was there any evidence that the defendant was provoked by his encounter with [Tyrod] and acted upon any provocation several hours after his interaction with [Tyrod], acting strictly on emotion, which is one of the key elements of heat of passion, voluntary manslaughter.  So it was based on the evidence that was presented during the course of the trial, after the Court had further opportunity to review the evidence in the form of the testimony, that the Court concluded that there was no basis for giving CALCRIM [No.] 570.  [¶]  The Court is giving CALCRIM [No.] 571 on imperfect self-defense, voluntary manslaughter."

30.

The jury was thereafter instructed on transferred intent (CALCRIM No. 562),[27] imperfect self-defense (CALCRIM No. 571),[28] and complete self-defense (CALCRIM No. 505).

---

[27]     As to CALCRIM No. 562, the jury was instructed:

"If … the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

[28]     As to CALCRIM No. 571, the jury was instructed:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if: [¶] One, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] And two, the defendant actually believed that the immediate use of deadly force was necessary to defend against that danger; [¶] But three, at least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. [¶] Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.

"A danger is imminent if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and presen[t] so that it must be instantly dealt with. It may not be merely prospective or in the near future.

"If you find that Tyrod … threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs. [¶] If you find that the defendant knew that Tyrod … had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

31.

## B. Law

Voluntary manslaughter is an unlawful killing without malice, and a lesser included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) Heat of passion and imperfect self-defense are two theories of voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101, 108 [heat of passion]; *People v. Rangel* (2016) 62 Cal.4th 1192, 1226 [imperfect self-defense].)

The factor that distinguishes heat of passion manslaughter from murder is provocation. (*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila*).) "Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation …." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.) The provocation must have been "'caused by the victim'" or be conduct the defendant "'reasonably believed … to have been engaged in by the victim.'" (*Ibid.*) "'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.'" (*Id.* at pp. 583–584.) Heat of passion arises when, at the time of the killing, the defendant's reason is impaired by passion to such an extent as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances (*Avila*, *supra*, at p. 705) or in the mind of someone with ordinary self-control (*People v. Hurtado* (1883) 63 Cal. 288, 292).

"To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection.… [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another

---

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) "[P]rovocation is sufficient [when] … it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment. If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate .…" (*Id*. at p. 950.)

"'[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. Thus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate .… Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances, the jury is properly to be told that the exciting cause must be such as would naturally tend to arouse the passion of the ordinarily reasonable man. But as to the nature of the passion itself, our law leaves that to the jury, under these proper admonitions from the court.' [Citation.] As the court long ago explained in *People v. Jones* (1911) 160 Cal. 358, 368, 'it is not a matter of law but a matter of fact for the jury in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions and so lessen the degree of the offense by relieving it from the element of malice.'" (*Beltran*, *supra*, 56 Cal.4th at pp. 950–951.) If, instead, the standard were purely subjective, "'then, by habitual and long continued indulgence of evil passions, a bad man might acquire a claim to mitigation which would not be available to better men, and on account of that very wickedness of heart which, in itself, constitutes an aggravation both in morals and in law.'" (*Id.* at p. 951.)

Because heat of passion voluntary manslaughter is a lesser included offense of murder, a trial court may have a duty to instruct on it. "'A trial court has a sua sponte obligation to instruct the jury on any uncharged offense that is lesser than, and included in, a greater charged offense, but only if there is substantial evidence supporting a jury determination that the defendant was in fact guilty only of the lesser offense.'" (*People v. Rangel*, *supra*, 62 Cal.4th at pp. 1224–1225.) In noncapital cases such as this one, the failure to instruct on a lesser included offense is reviewed for harmless error under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, which asks whether it was reasonably probable the defendant would have obtained a better result had the instructional error not occurred. (*Id.* at p. 836; see *Breverman*, *supra*, 19 Cal.4th at pp. 148–149.)

C. **Analysis**

To prevail on appeal, defendant must show both that an instruction on heat of passion was warranted by the evidence (i.e., that the trial court erred in failing to instruct) and also that he would likely have obtained a better result at trial had the instruction been given (i.e., that defendant was prejudiced by the court's error).

To warrant instruction on heat of passion, there must be substantial evidence that at the time of the killing (1) the defendant's reason was actually obscured as a result of a strong passion, including anger, rage, or any violent, intense, highly wrought or enthusiastic emotion, but not revenge; (2) the passion was provoked by the victim's conduct, which may have been physical or verbal, comprising a single incident or numerous incidents over a period of time; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly from passion and without due deliberation and reflection. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481 (*Wright*).) The first two elements analyze the defendant's subjective state of mind; the third applies an objective standard. (*Ibid.*) We review the evidentiary support for an

34.

instruction in the light most favorable to the *defendant* and resolve doubts as to the sufficiency of the evidence in his favor. (*Id*. at p. 1483.)

Here, we conclude defendant's claim fails on the third element.

### 1.     Element One

As for the first element, that defendant's reason was actually obscured due to strong passion, defendant contends the jury could have found that he believed he was shooting Tyrod at 1:30 a.m. because he thought Tyrod had returned to the Zambrano home after threatening him. He argues Tyrod's behavior at 6:00 p.m. "clear[ly]" provoked him and caused him to feel "anger or some other hostile and violent emotion," and his belief that Tyrod had returned was sufficient to permit the jury to conclude the shooting was a rash act provoked by Tyrod.

The People respond that no "particularly strong evidence" proved defendant "was so affected to the degree that his reflection was eclipsed and he was simply reacting from emotion." Rather, the People argue, the evidence "describes an angry person," but not someone "whose ability to reflect [was] eclipsed, let alone one who remained so for several hours more."

Viewing the evidence in the light most favorable to defendant, as we must, we agree there was evidence he was subjectively agitated, and perhaps even passionate, until the time of Sierra's death.

The evidence showed that at about 7:00 a.m., Tyrod picked up Sierra from the Zambrano home in his Kia. He was observed by defendant, who was in the front yard "patrolling." By 3:00 p.m., Sierra had taken Tyrod's Kia and gone back to the Zambrano home's neighborhood. She parked outside the nearby apartment complex, then circled the area three times, as witnessed by Neighbor 1. At 4:30 p.m., she was parked outside the Zambrano home, as she told Eddie in a text message. At 6:00 p.m., Tyrod arrived at the Zambrano home looking for his Kia. He approached defendant, who was outside with Robert. Tyrod argued with defendant about Sierra and the Kia. Tyrod pulled out a

knife and threatened to return to the Zambrano home with more people if he did not get the Kia back. As Tyrod left, someone fired a weapon. At 7:00 p.m., defendant texted Eddie about the confrontation with Tyrod, saying Tyrod "came over tripping and pulled a knife in me and shot at hiim u better get here now." He asked Eddie to "[t]ell mom not to com home" because Tyrod "side he be right back." Around 7:45 p.m., defendant texted Eddie, "I only. Got 4 shell," and "Thare 4 cars serqel mom's house u bitches." He demanded Eddie hurry up and get home. This evidence supported the reasonable inference that defendant felt agitated and possibly threatened by Tyrod's actual and ostensible conduct.

This inference was also supported by text messages that demonstrated Eddie was aware defendant was agitated. When Tyrod told Eddie defendant shot at him, Eddie texted his friend Rabbit, "Wevneed to go my brother is shooting at people." Eddie, who was not home, tried to prevent further conflict by warning Tyrod, "Dnt go to my momz house like that, homeboy u should of asked me b4 you went overthere," explaining, "My brother is not going to put up wit shit like that." Eddie also tried to reassure defendant that Tyrod was not coming back, explaining he had talked to Tyrod and would handle things, texting, "Nobodys going overthere ok I got a hold of this nigga he dnt want none ok let me get home ill handel it ok.." Eddie warned Tyrod again to "[j]ust stay away from my momz hiuse thats all i ask."

Defendant's agitated condition was apparent when, around that time, Sierra returned to the Zambrano home in the Kia. She engaged in a verbal argument from the Kia, presumably with defendant because Eddie was not home yet. At some point, she got out of the Kia and engaged in a physical fight with a man—again, presumably defendant. The man yelled, "'Bitch, get out of my house,'" and it appeared that he was kicking Sierra out of the house. She was "screaming" and "retaliating."

Vincent also recognized that defendant was agitated that evening. At 8:15 p.m., before Eddie got home, Vincent texted a warning to Eddie that defendant was "all mad"

36.

and "might try something." Vincent testified that when Eddie returned home, he and defendant got into an argument, so Vincent left. Based on the timing of Vincent's text messages, defendant's argument with Eddie began before 9:00 p.m. and Vincent said the house was quiet when he came back around 10:00 or 11:00 p.m.

Even if all seemed quiet to Vincent, other activity was occurring. Sierra was repeatedly threatening to come back, and Eddie was attempting to convince her not to come. Before the shooting, two people were arguing outside, one telling the other to be quiet, and it was a reasonable inference that these two people were defendant and Eddie. Sierra returned in the Kia and drove up and down defendant's street five times—three times with her headlights on and then two times with them off. At 1:33 a.m., a car, probably the Kia, stopped and flashed its lights in the general direction of the Zambrano home for about 30 seconds. Defendant shot Sierra and, at 1:33 a.m., Eddie called 911.

Viewing the evidence in the light most favorable to defendant, we conclude a reasonable jury could infer that defendant believed Tyrod was returning at 1:30 a.m., after the 6:00 p.m. heated argument during which he brandished a knife and threatened to return, and that his apparent arrival late at night, first driving by the Zambrano home five times then approaching with the lights off, alarmed and provoked defendant to the point that he reacted under the influence of a strong passion without deliberation and reflection. Thus, substantial evidence supported this element.

### 2. Element Two

The second element, that defendant's passion was provoked by the victim's conduct, requires provocative conduct by the victim or provocative conduct reasonably attributed to the victim. Defendant acknowledges that the victim here, Sierra, was not a source of sufficient provocation. His theory is instead that the evidence reasonably suggested Tyrod was the source of provocation and defendant shot Sierra in the heat of passion believing he was shooting at Tyrod, based on Tyrod's "prior threats and the time and manner of the [Kia]'s approach"—i.e., with headlights off in the middle of the night.

37.

Based on our discussion of the facts under element one, we conclude that a reasonable jury could conclude it appeared to defendant that Tyrod drove to the Zambrano home in the Kia at 1:30 a.m., drove by repeatedly, then approached with the lights off. Substantial evidence supported this element.

### 3. Element Three

Where defendant's argument breaks down is the third element, which requires conduct so inflammatory that an *ordinarily reasonable* person—not just defendant— would be goaded into an intense state of hot-blooded emotional turbulence and "simply *react*, without reflection." (*Beltran*, *supra*, 56 Cal.4th at p. 949.) Crediting the evidence in defendant's favor, we conclude the provocative conduct at issue here could not support the ordinarily reasonable person standard of this element.

Generally, courts have held that verbal arguments, even those involving assault, are insufficient to incite heat of passion in an ordinary person with an average disposition. Here, defendant's 6:00 p.m. interaction with Tyrod amounted to a verbal argument in which the victim swore, displayed a weapon, and threatened to return if he did not get his property back. Under similar facts, the Supreme Court held in *People v. Gutierrez* (2009) 45 Cal.4th 789 that a verbal argument—even when accompanied by swearing, scratching, kicking, and taunting by the victim—did not warrant an instruction on heat of passion:

> "Here, no evidence was introduced that [the] defendant was so inflamed that he killed the victim in a heat of passion. [The d]efendant testified that he and [his ex-girlfriend] engaged in a verbal argument prior to his taking his son and leaving [his ex-girlfriend's] house. [The d]efendant testified that he told [her], '[g]et off me, you f…ng bitch,' and that she 'cuss[ed] back at' him. We have held that calling the defendant 'a "mother f…er" and … repeatedly asserting that if [the] defendant had a weapon, he should take it out and use it … plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment.' [Citation.] Similarly, the verbal exchange described by [the] defendant in the present case did not constitute sufficient provocation for voluntary manslaughter.

38.

"[The d]efendant also testified that [his ex-girlfriend] scratched his chest, he kicked her, she kicked him in the leg and grabbed his shirt, and he pulled away. Simple assault, such as the tussle [the] defendant described, also does not rise to the level of provocation necessary to support a voluntary manslaughter instruction. [Citation.] Indeed, rather than causing [the] defendant to become enraged, [the] defendant testified that he simply walked away. Accordingly, we conclude that the trial court did not err by refusing to give a voluntary manslaughter instruction, because that instruction was not supported by the evidence." (*People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 826–827.)

Similarly, in *Avila*, *supra*, 46 Cal.4th 680, the Supreme Court held that the defendant's argument with the victim did not warrant instruction on heat of passion:

"The record indicates that the victims and their friends, who were not armed, were socializing in a parking lot, and that two of the friends, Pereira and Casas, were talking with three young women [they had met that evening]. A dark-colored vehicle pulled into the parking lot. [The d]efendant and one or two other men got out and walked toward the group of friends. The men told at least two of the women to get in the car. The women refused to leave, and [the] defendant became irate. [A witness] heard Pereira say 'Carmelos,' which [the witness] did not recognize, but assumed was a gang name. [The d]efendant said 'Crown Town' or 'Corona.' Pereira and Montoya briefly argued with [the] defendant, and someone from [the] defendant's group suggested they go 'one-on-one.' Montoya said [the] defendant was free to take the women, and said '[t]here's no big problem here.' The confrontation appeared to dissipate, and Montoya and his friends started toward their vehicles. None of these events was sufficient 'to arouse feelings of homicidal rage or passion in an ordinarily reasonable person.' [Citation.]

"[The d]efendant asserts, however, that there was sufficient evidence of provocation … because Pereira was the first one to confront [the] defendant, making the victims and their friends the initial aggressors. Contrary to [the] defendant's assertion, [the witness] did not so testify. Rather, [the witness] testified that as [the] defendant and one or two others started walking toward everyone in the group of friends, Pereira 'was the first one to confront them or talk to them.' This is not evidence Pereira was initially aggressive. [The d]efendant also relies on [the witness's] testimony that Pereira yelled out 'Carmelos.' [The witness] had 'no idea' what this term meant, but assumed it was 'a gang … or something like that.' Even assuming it was reference to a gang, and that a gang member might have perceived the statement as some sort of a challenge, the

39.

requisite provocation must be one that would provoke an ordinarily reasonable person. [Citation.] Reasonable people do not become homicidally enraged when hearing the term 'Carmelos,' even if it is understood as a fleeting gang reference or challenge.

"Also contrary to [the] defendant's assertion, there is no evidence that during this verbal confrontation, blows were exchanged. [The d]efendant asserts that victim 'Montoya personally agreed to fight the Corona men.' He relies on … testimony that one person from [the] defendant's group said 'they wanted to fight … one-on-one with one of us, … which one of 'em was man enough to fight him.' [The witness] could not 'remember for sure,' but thought perhaps [the victim] had responded, '[A]ll right, you know, if you want.' Again, even assuming this response was made, it is scarcely a comment that would reasonably incite homicidal rage.…

"In sum, there was no substantial evidence of provocation to support voluntary manslaughter or attempted voluntary manslaughter instructions, and [the] defendant's request for such instructions was therefore properly denied." (*Avila*, *supra*, 46 Cal.4th at pp. 705–707.)

In contrast, instruction on heat of passion was warranted in *Breverman*, *supra*, 19 Cal.4th at pages 163–164, where the defendant shot at a group of armed men who trespassed onto his property, challenged him to fight, and used weapons to "batter and smash" his car:

"Here, there was evidence that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon domestic property occupied by [the] defendant and acted in a menacing manner. This intimidating conduct included challenges to the defendant to fight, followed by use of the weapons to batter and smash [the] defendant's vehicle parked in the driveway of his residence, within a short distance from the front door. [The d]efendant and the other persons in the house all indicated that the number and behavior of the intruders, which [the] defendant characterized as a 'mob,' caused immediate fear and panic. Under these circumstances, a reasonable jury could infer that [the] defendant was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition.

"A rational jury could also find that the intense and high-wrought emotions aroused by the initial threat had not had time to cool or subside by

the time [the] defendant fired the first few shots from inside the house, then emerged and fired the fatal second volley after the fleeing intruders. At one point in his police statement, [the] defendant suggested that he acted in one continuous, chaotic response to the riotous events outside his door." (*Breverman*, *supra*, 19 Cal.4th at pp. 163–164.)

Instruction was also warranted in *People v. Barton* (1995) 12 Cal.4th 186 (*Barton*), where the defendant shot a man who tried to run his daughter off the road:

> "The record contains substantial evidence, some of it offered by the prosecution and some by the defense, from which the jury could reasonably find that [the] defendant intentionally killed Sanchez in a sudden quarrel or heat of passion. [The d]efendant testified that shortly before the killing of Sanchez, his daughter Andrea had come to him, extremely upset, and told him that a man (later identified as victim Sanchez) had threatened her with serious injury by trying to run her car off the road, and that he had spat on the window of her car. When [the] defendant and his daughter confronted Sanchez about his conduct, Sanchez called [the] defendant's daughter a 'bitch' and he acted as if he was 'berserk.' [The d]efendant and Sanchez angrily confronted each other and Sanchez assumed a 'fighting stance,' challenging [the] defendant. After [the] defendant asked his daughter to call the police, Sanchez started to get into his car; when [the] defendant asked Sanchez where he was going, Sanchez replied, 'none of your fucking business,' and taunted [the] defendant by saying, 'Do you think you can keep me here?' Screaming and swearing, [the] defendant, before firing, ordered Sanchez to 'drop the knife' and to get out of his car, threatening to shoot if Sanchez did not do so. This testimony provided substantial evidence from which a reasonable jury could conclude that when [the] defendant killed Sanchez, [the] defendant's reason was obscured by passion to such an extent as would cause an ordinarily reasonable person to act rashly and without reflection, and that [the] defendant thus shot Sanchez in a sudden quarrel or heat of passion." (*Barton*, *supra*, 12 Cal.4th at p. 202.)

The present case, however, is not comparable to either *Breverman* or *Barton*. Tyrod's conduct—swearing, holding a knife, and saying that he would come back to defendant's house if he did not get his Kia back—simply did not rise to the level of provocation that would cause an ordinarily reasonable person to become so incensed or emotionally overwrought that their ability to reason and think logically was eclipsed.

Nor can we say that Tyrod's ostensible 1:30 a.m. approach to the Zambrano home in the Kia with the headlights off—seven hours after the heated argument—was sufficient

to provoke an ordinarily reasonable person into a state of passion. Seven hours is generally a sufficiently long period of time for a reasonable person's passions to cool, especially after a mere argument. (*See People v. Hach* (2009) 176 Cal.App.4th 1450, 1453–1459 [sufficient cooling period where the defendant quarreled with the victim in the afternoon, the victim left at 6:00 p.m., and the defendant waited several hours before finding and killing the victim's new boyfriend]; see also *People v. Moye* (2009) 47 Cal.4th 537, 550 (*Moye*).)

While defendant is correct that heat of passion can be provoked by a series of events over an extended period of time, success on this theory generally hinges upon the breakdown of an existing relationship between the victim and the defendant, which was not present here. In *People v. Berry* (1976) 18 Cal.3d 509, for example, the defendant "did not deny strangling his wife, but claimed through his own testimony and the testimony of a psychiatrist, Dr. Martin Blinder, that he was provoked into killing her because of a sudden and uncontrollable rage …." (*Id.* at p. 513.) He testified his wife left the country shortly after they were married and, upon her announced return, "she had fallen in love with another man, one Yako, and had enjoyed his sexual favors, that he was coming to this country to claim her and that she wished a divorce." (*Ibid.*) The wife spent the next two weeks "alternately taunt[ing] [the] defendant with her involvement with Yako and at the same time sexually excited [the] defendant, indicating her desire to remain with him." (*Ibid.*) The Supreme Court held these facts sufficient to "arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Id.* at p. 515.)

Similarly, in *People v. Borchers* (1958) 50 Cal.2d 321, the defendant killed his mistress after a long period of provocative conduct that included her "admitted infidelity, her statements that she wished she was dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that [the] defendant shoot her … and himself on the night of the homicide, and her taunt, 'are you chicken[?]'" (*Id.* at pp. 328–329.) The

Supreme Court held these facts supported a finding that the defendant acted "in wild desperation induced by [his mistress's] long continued provocatory conduct." (*Id.* at p. 329.)

Finally, in *Wright*, *supra*, 242 Cal.App.4th 1461, "abundant evidence" was presented regarding "the acrimonious relationship between [the] defendant and [her ex-boyfriend], particularly concerning their ongoing custody battle over their son .…" (*Id.* at p. 1483.) He made "repeated threats to take custody of their son away" and the evidence reflected an "ongoing battle … over custody, child support, and their son's care." (*Id.* at pp. 1483, 1485.) The defendant was provoked into to a state of "intense fear, anxiety, hopelessness, depression and anger that obscured her reason." (*Id.* at p. 1483.) The Supreme Court held the evidence supported an instruction on heat of passion. (*Id.* at p. 1486.)

In this case, there was no substantial evidence of a longstanding relationship between either defendant and Tyrod, or defendant and Sierra, or of a history of ongoing abuse or taunting. Tyrod knew about defendant generally through Sierra, but did not personally know him. Tyrod claimed Sierra had slept with defendant, but there was no other evidence that corroborated the existence of a sexual relationship between defendant and Sierra.

The facts here are akin to those in *Moye*, in which the defendant got into a fight with his girlfriend's daughter's boyfriend one night and then killed him the following morning. (*Moye*, *supra*, 47 Cal.4th at p. 542.) A group of men, including the victim, "got into an argument" with the defendant "that quickly escalated into a fistfight." (*Ibid.*) The victim hit or tapped the defendant twice in the back with a baseball bat. (*Ibid.*) The next morning, the defendant drove around to look for the victim. (*Id.* at p. 543.) When the defendant eventually caught up with him, he grabbed the victim's baseball bat and used it to bludgeon the man to death. (*Id.* at p. 546.) The Supreme Court held the evening fight "did not itself constitute legally sufficient provocation to require instruction

43.

on sudden quarrel/heat of passion voluntary manslaughter in connection with the killing of [the victim] the following day." (*Id.* at p. 551.) Further, "the victim's asserted act of kicking [the] defendant's car on Sunday morning just before [the] defendant … gave chase likewise did not itself constitute legally sufficient provocation to cause an ordinarily reasonable person to act out of a heat of passion and kill [the victim] in response." (*Ibid.*)

Here, this objective ordinarily reasonable person element was significantly undermined by evidence that defendant had a *reputation* for violence, that is, for reacting more violently than those around him. There was evidence that Eddie and Vincent were aware not just that defendant was agitated, but that he had a propensity for violence. Eddie texted Rabbit that he had to leave the casino because defendant was shooting at people and causing problems at home, suggesting that Eddie knew defendant might continue to act inappropriately. Eddie also texted Tyrod that he should not have gone to the Zambrano home because defendant would not "put up wit shit like that." Vincent texted Eddie to be careful because defendant was "all mad" and "might try something." When Eddie got home, he argued with defendant. Vincent left because of the argument and did not want to return without Eddie's assurance that it was okay to do so.

The evidence demonstrated that even Eddie—who himself had reason to be provoked by the events, and who may have had something of a reputation of his own for violence (based on Robert's statement, "'I know how they are'")—responded in a far more reasonable manner than defendant. Indeed, the prosecutor described Eddie as the "peacemaker." Although Eddie and Tyrod began their texting in an aggressive and antagonistic manner, both attempted to defuse the tension and resolve their conflict in an amicable way.

Their interaction began around 6:30 p.m., when Tyrod texted Eddie, "Your brother shot at me .. Sierra told me ya together riding around in my car .. U think im a sucker … I should bring the police to ur house .. But im a street nigga so u trying play games ..

44.

That's fucked up cause I respected ya relationship n u tried me like im a punk." Eddie responded in kind, texting, "Dnt go to my momz house like that homeboy u should of asked me b4 u went overthere, i dnt want no problems but we could get bizzy if it cumz down to it. I had nothing to do wit what sierra did .… My brother is not going to put up wit shit like that."

By 8:16 p.m., however, Eddie appeared genuinely invested in helping Tyrod deal with Sierra, texting him, "A dog im abt to pull up to my house sierra is hiding and im going to find out where shes at. Thiz is a big fuckn mess but its going to get fixed.…" Tyrod thanked him, and the men texted cordially with one another. At 10:05 p.m., Eddie followed up with Tyrod to let him know that Sierra was about to confirm the Kia's location, and asked, "r we good or what?" Tyrod said yes and apologized, stating, "Yeah we good .. My bad for comong to your house like that ..I was mad and not thinking clear." Eddie said he understood and "would of been heated too." An hour later, Tyrod texted Sierra that Eddie was "cool." Moreover, Eddie's repeated efforts to keep Sierra from coming to the Zambrano home late that night supported the inference that he was aware of defendant's violent propensity, feared defendant would do something if he saw the Kia there, and attempted to prevent that from happening.

Thus, despite Tyrod's threatening conduct and Sierra's and Tyrod's many calls and text messages, Eddie was not provoked into a heat of passion, but instead de-escalated the conflict and attempted to prevent the violence. Eddie and Tyrod navigated the incident in a manner vastly different than defendant. Their ability to do so strongly rebutted the idea that Tyrod's conduct was so inflammatory that an ordinarily reasonable person of average disposition would have been provoked into a state of overpowering passion or rage.

We conclude a rational jury could not find that an ordinarily reasonable person would have been provoked into a heat of passion by these facts. If defendant felt agitated, threatened, and angry by what he believed was Tyrod's hostile conduct at

45.

1:30 a.m., he could have stayed inside and called the police. Instead, he waited outside with a loaded shotgun, moved forward to the Kia as it approached (as the spent shells demonstrated), and shot at it not once but three times. As courts have said, a killing by a "'man of extremely violent passion'" cannot be mitigated to voluntary manslaughter if the provocation would not also have caused an ordinarily reasonable man to react from passion and without reflection. (*Beltran*, *supra*, 56 Cal.4th at p. 950.) Here, we conclude the provocation would not have done so and, thus, this element was not supported by substantial evidence.

### 4. Conclusion

Even if a rational jury could believe defendant was actually provoked into a violent passion by Tyrod's actual and ostensible conduct, a rational jury could not find the ordinarily reasonable person standard of the third element satisfied.[29] The instruction on heat of passion was not warranted and the trial court did not err in declining to provide it.

### 5. Harmless Error

In any event, even if we were to agree that the trial court erred, we would conclude defendant was not prejudiced by the court's failure to instruct on heat of passion. "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable

---

[29] Our conclusions apply all the more to a theory that defendant was provoked into a violent passion by *Sierra's* conduct (which did not include pulling a knife on defendant) and knew he was shooting at Sierra. There was evidence to support both theories, and the prosecutor argued both theories to the jury.

probability the error of which the defendant complains affected the result.'" (*Beltran*, *supra*, 56 Cal.4th at p. 956.)

Here, the jury was instructed on, and rejected, theories of reasonable and unreasonable self-defense. The evidence suggested defendant felt threatened by Tyrod's conduct and believed his house might come under attack. Defendant's belief that Tyrod would return, his worry over his supply of ammunition, his fear for his mother's safety, and his observation that his house was being circled by four cars were pieces of evidence the jury weighed *and rejected* when it considered whether defendant had a reasonable or unreasonable belief in the need for self-defense. The same facts formed the basis of defendant's heat of passion argument. "[T]he jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter." (*Moye*, *supra*, 47 Cal.4th at p. 557.)

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P.J.

DE SANTOS, J.

47.